# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

MELISSA YEARWOOD,                        )
                                         )
      Plaintiff,                         )
                                         )    **Civil Action No. 3:12-cv-01091**
v.                                       )    **Judge Nixon / Knowles**
                                         )
CAROLYN W. COLVIN,                       )
Acting Commissioner of Social Security,[1]  )
                                         )
      Defendant.                         )

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Supplemental Security Insurance ("SSI"), as provided under Title XVI of the Social Security Act ("the Act"), as amended. The case is currently pending on Plaintiff's Motion for Judgment on the Administrative Record. Docket No. 12. Defendant has filed a Response, arguing that the decision of the Commissioner was supported by substantial evidence and should be affirmed. Docket No. 19. Plaintiff has filed a Reply, disputing Defendant's assertion that the Commissioner's decision was adequately supported. Docket No. 22.

For the reasons stated below, the undersigned recommends that Plaintiff's Motion for

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Fed. R. Civ. P. 25(d), Carolyn W. Colvin should therefore be substituted for Commissioner Michael J. Astrue as the Defendant in this action. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

1

Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner

be AFFIRMED.

## I. INTRODUCTION

Plaintiff filed her application for Supplemental Security Income ("SSI") on April 3, 2009,

alleging that she had been disabled since August 27, 2008, due to scoliosis, arthritis, diabetes,

high blood pressure, depression, sleep apnea, and "back problems." *See, e.g.,* Docket No. 10,

Attachment ("TR"), pp. 138, 152. Plaintiff's application was denied both initially (TR 73) and

upon reconsideration (TR 74). Plaintiff subsequently requested (TR 87) and received (TR 97) a

hearing. Plaintiff's first hearing was conducted on January 20, 2011, by Administrative Law

Judge ("ALJ") John Daughtry.[2] TR 34. Plaintiff's second hearing was conducted on May 17,

2011, also by ALJ John Daughtry. TR 44. Plaintiff and Vocational Expert, Lisa Courtney,

appeared and testified at the second hearing. *Id.*

On July 12, 2011, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff

was not disabled within the meaning of the Social Security Act and Regulations. TR 28.

Specifically, the ALJ made the following findings of fact:

> 1.  The claimant has not engaged in substantial gainful activity
>     since the application date (20 CFR 416.971 *et seq.*).
>
> 2.  The claimant has extreme obesity, diabetes mellitus,
>     obstructive sleep apnea, degenerative joint disease,
>     borderline intellectual functioning (BIF), major depressive
>     disorder, personality disorder, and history of post-traumatic
>     stress disorder (PTSD), which are considered to be a

---

[2] Plaintiff appeared pro se at her first hearing, explained that she had been unable to secure counsel, and expressed a desire for more time to obtain representation. *See* TR 36-42. The ALJ agreed to reschedule the hearing for a later date, so that Plaintiff could secure counsel. *See id.*

2

"severe" combination of impairments but not severe enough, either singly or in combination, to meet or medically equal the requirements set forth in the Listing of Impairments. Appendix I to Subpart P, Regulations No. 4 (20 CFR 416.920(c)).

3. After consideration of the entire record, the Administrative Law Judge finds that the claimant has the residual functional capacity to lift and carry up to 20 pounds occasionally and up to 10 pounds frequently; stand and walk up to or about four hours in an eight-hour workday and may require the option to sit/stand every 30 minutes; sit up to or about six hours in an eight-hour workday; perform unlimited ability to push and pull; frequently climb stairs/ramps, balance, stoop and crawl; occasionally crouch; occasionally work around hazards, such as heights and moving machinery; and should not climb ladders, ropes or scaffolds. Additionally, the claimant can understand, remember and carry out routine, repetitive one-two step directions; can maintain concentration and persistence for routine, repetitive one-two step tasks for two-hour periods; can interact with the general public, co-workers and supervisors; and can adapt to gradual, infrequent workplace changes; but cannot perform production rate, pace assembly line work.

4. The claimant has no past relevant work (20 CFR 416.965).

5. The claimant was born on July 21, 1970 and was 38 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

6. The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

7. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

8. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

3

9.      The claimant has not been under a disability, as defined in the Social Security Act, since March 11, 2009, the date the application was filed (20 CFR 416.920(g)).

TR 18-27.

On September 1, 2011, Plaintiff timely filed a request for review of the hearing decision. TR 12.  On August 22, 2012, the Appeals Council issued a letter declining to review the case (TR 1-3), thereby rendering the decision of the ALJ the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the Commissioner's findings are supported by substantial evidence, based upon the record as a whole, then these findings are conclusive. *Id.*

## II.  REVIEW OF THE RECORD

The parties and the ALJ have thoroughly summarized and discussed the medical and testimonial evidence of Record. Accordingly, the Court will discuss those matters only to the extent necessary to analyze the parties' arguments.

## III.  CONCLUSIONS OF LAW

### A.  Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991).  The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999)

4

(*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). However, if the Commissioner did not consider the record as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985) (*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson,* 484 F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

### B. Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful

5

activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied. 42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

> (1) If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
>
> (2) If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
>
> (3) If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[3] or its equivalent. If a listing is met or equaled, benefits are owing without further inquiry.
>
> (4) If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations). By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a prima facie case of disability.
>
> (5) Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

---

[3] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

6

20 C.F.R. §§ 404.1520, 416.920 (footnote added). *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination. *Id.* In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony. *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B).

### C.  Plaintiff's Statement Of Errors

Plaintiff contends that the ALJ erred in failing to: (1) consider all of her impairments and provide sufficient reasoning as to why he determined some impairments to be nonsevere; (2) properly consider the opinion of M. Todd Linville, FNP; (3) properly evaluate the opinion of consultative examiner Dr. Dorothy Lambert and include the exact language of Dr. Lambert's opinion in the hypothetical he presented to the vocational expert; (4) consider the functional

7

effects of her obesity; and (5) properly evaluate her credibility. Docket No. 12-1. Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed, or in the alternative, remanded. *Id.*

> Sentence four of § 405(g) states as follows:
>
>> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

## 1. Finding of Nonseverity

Plaintiff argues that the ALJ erred in not properly considering all of her impairments and in not providing sufficient reasoning as to why he found some of her impairments to be nonsevere. Docket No. 12-1. Specifically, Plaintiff contends that although she has been diagnosed with "fibromyalgia; arthritis; HTN; neuropathy; and insomnia," the ALJ did not find that these were severe impairments and did not explain his rationale for so doing. *Id.* Plaintiff asserts that these impairments are diagnosed and well-documented in the record, cause more than a slight abnormality on her ability to function, and cause additional limitations which affect her

8

ability to perform the RFC assigned to her.  *Id.*

Defendant responds that, although Plaintiff asserts that the impairments at issue were diagnosed and well-documented in the record and cause more than a slight abnormality on her ability to function, Plaintiff does not cite to any specific evidence of record to support these assertions.  Docket No. 19.  Defendant argues therefore, that Plaintiff failed to carry her burden at this step in the sequential evaluation.  *Id.*  Defendant additionally argues that the ALJ appropriately explained why he found these impairments to be nonsevere.  *Id.*[4]

As an initial matter, an impairment can be considered nonsevere only if it is so slight that it could not result in a finding of disability, no matter how adverse a claimant's vocational factors might be.  *See, e.g.*, *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988); *Salmi v. Secretary of H.H.S.*, 774 F.2d 685, 691-92 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 971-72 (6th Cir.1985).  When an ALJ finds that a claimant has at least one severe impairment and proceeds to complete the sequential evaluation process, however, the ALJ's failure to find that another condition is a severe impairment cannot constitute reversible error. *See Maziarz v. Secretary*, 837 F.2d 240, 244 (6th Cir. 1987).

In the case at bar, the ALJ found that the following impairments, in combination, were severe: extreme obesity, diabetes mellitus, obstructive sleep apnea, degenerative joint disease, borderline intellectual functioning ("BIF"), major depressive disorder, personality disorder, and history of post-traumatic stress disorder ("PTSD").  TR 18.  Because the ALJ found that Plaintiff had at least one severe impairment and proceeded to complete the sequential evaluation process, any alleged failure of the ALJ to find other impairments severe cannot constitute grounds for

---

[4] Plaintiff's Reply does not further address this statement of error.  *See* Docket No. 22.

9

reversal. *Maziarz*, 837 F.2d at 244. Accordingly, Plaintiff cannot prevail on this ground.

Moreover, the ALJ discussed Plaintiff's testimony and the evidence of record when explaining his rationale for finding several of these impairments to be nonsevere. As relates to the impairments at issue, summarizing Plaintiff's testimony and the evidence of record, the ALJ stated generally that:

> The claimant testified at the hearing that . . . [s]he has left hip, leg and back pain and rates her pain as 9 ½ on a 0 to 10 pain scale, even with Lyrica and Ibuprofen. She also takes Metformin and two other medications for diabetes, but her sugar level stays high and she experiencing [*sic*] swelling. She also has severe sleep apnea, high cholesterol and high blood pressure. However, her blood pressure is controlled with medication. . . .
>
> . . .
>
> Review of records showed an obese individual who reportedly had a history of diabetes mellitus, gastroesophageal reflux disease (GERD), hypertension, obstructive sleep apnea, lumbar degenerative joint disease with scoliosis. However, the evidence of record is devoid of actual diagnostic test results of the lumbar spine or any sleep study confirming obstructive sleep apnea. Although the claimant consistently had complaints of left hip pain, treatment notes merely indicate that an MRI of this affected joint yielded normal results. Exhibit 1F.

TR 20, 21, *citing* TR 224-44.

Regarding Plaintiff's fibromyalgia specifically, the ALJ stated that:

> . . . In January 2010, the claimant's diagnoses included fibromyalgia. However, the claimant's treatment records provide little support for such a conclusion, i.e., no positive trigger points and no complaints of widespread joint pain . . .

TR 22.

As pertains to Plaintiff's claims of arthritis, the ALJ actually found that Plaintiff's degenerative joint disease was a severe impairment. TR 18. Specifically, the ALJ discussed her

10

joint pain and mobility as follows:

> . . . She has left hip, leg and back pain and rates her pain as a 9 ½ on a 0 to 10 pain scale, even with Lyrica and Ibuprofen. . . .

> . . .

> . . . a full range of motion was found in her left hip. . .

> . . .

> . . . Although the claimant consistently had complaints of left hip pain, treatment notes merely indicate that an MRI of this affected joint yielded normal results. Exhibit 1F. Notably, the claimant's treatment records reflect essentially no change in the overall physical condition of the claimant as examinations throughout treatment were basically brief and unimpressive; and certainly not indicative of disability.

> In November 2006, the claimant was obtaining care from the Family Health Care Group and reported left hip pain . . . The following month, a full range of motion was found in her left hip . . . Additionally, no abnormality was noted in any system of the claimant's body, to include musculoskeletal and neurological during an examination performed in September 2007. A normal examination was again reflected in August 2008 . . .

> . . .

> . . . She also reported . . . continuing left hip and left knee pain. *However, she actually stated that ibuprofen "did wonders" for her back pain, but she was out of this medication at the time.* . . .

> The claimant ambulated with a normal gait during a consultative examination performed by Bruce A. Davis, M.D., in June 2009 . . . There was full range of motion of the cervical spine; and bilateral shoulders, elbows, wrists and fingers, with 5/5 grip. Lumbar scoliosis was present, but neither tenderness nor spasm was appreciated. Thoracolumbar flexion was performed to 70 degrees, extension to 15 degrees and lateral motion to 20 degrees; while bilateral hip flexion and abduction was done to 120 degrees and 40 degrees, respectively. Range of motion of the bilateral knees was noted as normal and straight leg raising was negative. . . .

11

TR 20-22, *citing* TR 224-44 (italics original).

Beyond noting Plaintiff's reported blood pressures, regarding Plaintiff's hypertension, the ALJ stated in part:

> The claimant also alleged disability due to hypertension. Although the claimant's blood pressure levels were elevated at times, her hypertensive state was deemed controlled in the treatment notes. The claimant also testified her blood pressure was controlled with medication.

TR 18-19.

Relating to Plaintiff's professed neuropathy, the ALJ discussed Plaintiff's diabetes throughout, and actually found her diabetes to be a severe impairment. *See* TR 18-22, 25-26. Inasmuch as Plaintiff's reports of numbness, pain, and decreased sensitivity can be attributed to Plaintiff's potential neuropathy, the ALJ stated:

> . . . all four extremities were without edema, all deep tendon reflexes were equal (approximately one-plus); and no sores were present on either foot. . . .
>
> . . .
>
> . . . *She moved all extremities without tremor and was again neurologically intact. . . . Her gait was steady. . . .* However, she had complaints of numbness of the bilateral lower extremities, accompanied by swelling and bilateral knee pain, as well. While decreased sensitivity was discovered in the feet, more so on the left than the right, her knees were non-edemic. . . . She also reported . . . having no balance . . .
>
> . . . No cyanosis, edema, clubbing, or other deformity was present in any extremity. The claimant performed gain maneuvers with an unsteadily [*sic*] across the room without assistance. She was neurologically intact. . . .

TR 21-22 (italics original).

Lastly, regarding Plaintiff's claimed insomnia, the ALJ determined that Plaintiff's

12

obstructive sleep apnea was a severe impairment. TR 18. Discussing Plaintiff's sleep issues, the ALJ stated:

> . . . she also takes medication to help her sleep.
>
> . . .
>
> . . . the claimant . . . reported that she needs a new CPAP machine.
>
> . . .
>
> *. . . she admitted to the nursing assistant that her sleep was great, sleeping 7-8 hours a night . . . However, she reported to the medical management physician (name not indicated) later that same day, that her sleep was poor . . . later, the claimant confirmed her progress as she reported to the medication management physician that her mood was good; while her sleep, appetite, energy concentration* [*sic*] *were all normal. . . .*
>
> . . .
>
> . . . the claimant repeatedly admitted she was doing better with full compliance with medication. Specifically, her mood was reportedly good and stable, while her sleep was "great." . . .

TR 20-24 (italics original).

As can be seen, the ALJ considered Plaintiff's fibromyalgia, arthritis, hypertension, neuropathy, and insomnia. In fact, the ALJ actually found that Plaintiff's degenerative joint disease and obstructive sleep apnea were severe impairments. TR 18. When discussing the impairments at issue, the ALJ noted that each of these conditions was either controlled by medication or did not substantially interfere with Plaintiff's abilities, as evidenced by Plaintiff's treatment records. Even if Plaintiff was correct in her contention that the ALJ should have found some or all of these impairments to be severe, as discussed above, when an ALJ finds that a claimant has at least one severe impairment and proceeds to complete the sequential evaluation

13

process, the ALJ's failure to find that another condition is a severe impairment cannot constitute reversible error. *See Maziarz v. Secretary*, 837 F.2d 240, 244 (6th Cir. 1987). The ALJ ultimately found that Plaintiff had eight impairments that, in combination, were severe. TR 18. Accordingly, this claim fails.

## 2. Medical Source Statement of M. Todd Linville, FNP

Plaintiff argues that the ALJ erroneously failed to mention 2 medical source statements provided by M. Todd Linville, FNP. Docket No. 12-1, *referencing* TR 445-47, 449-54. Plaintiff contends that the ALJ should have considered these opinions when determining her residual functional capacity. *Id*. Plaintiff further contends that, had the ALJ incorporated Nurse Linville's opinion that Plaintiff could only stand for 15 minutes into his residual functional capacity finding, he would have found that such a limitation would preclude Plaintiff from engaging in productive work. *Id*.

Defendant responds that the ALJ discussed the treatment records provided by Nurse Linville at length, and that these records provide "little if any support for Plaintiff's allegations of severe limitations." Docket No. 19. Defendant notes that, although the ALJ did not explicitly discuss the 2 medical source statements at issue, the ALJ properly incorporated into his residual functional capacity findings the portions of Nurse Linville's assessments that were supported by her treatment notes and the evidence of record, and properly disregarded the portions that were inconsistent with her own treatment notes and with Plaintiff's self-reported daily activities. *Id.*

Plaintiff, in her Reply, reiterates that the ALJ's consideration of Nurse Linville's treatment records was not sufficient because the ALJ should have explicitly discussed her medical source statements. Docket No. 21. Plaintiff also contends that the "mere discussion of

14

FNP Linville's treatment records does not amount to a proper evaluation of FNP Linville's opinion as required by SSR 06-3p and <u>Cruse</u>." *Id.* (underlining original).

As an initial matter, Nurse Linville, as an FNP, is not considered an "acceptable medical source" for purposes of rendering an opinion on disability; rather, as an FNP, she is considered an "other source." The Regulations provide that the ALJ may properly

> "use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work. Other sources include, but are not limited to -
>
> (1) Medical Sources not listed in paragraph (a) of this section (for example, nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists).

20 C.F.R. § 404.1513(d).

When considering opinions rendered by "other sources," the ALJ "generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." SSR 06-3p.

In the medical source statement (mental) at issue, Nurse Linville opined that Plaintiff had moderate or marked limitations in all aspects except her ability to carry out simple instructions. TR 445-47. When asked to identify the medical signs, laboratory findings, or other factors that supported these opinions, Nurse Linville noted only "increasing difficulty reading." *Id.* Nurse Linville did not cite to any objective evidence, medical signs, or laboratory findings. *See id.*

With regard to the medical source statement (physical) at issue, Nurse Linville opined that Plaintiff could occasionally lift up to 20 pounds, but never lift more than that; frequently

15

carry up to 10 pounds, occasionally carry up to 20 pounds, and never carry more than that; sit for 30 minutes at one time without interruption, and 4 hours total in an 8-hour workday; stand for up to 15 minutes at one time without interruption, and 3 hours total in an 8-hour workday; and walk for up to 10 minutes at one time without interruption, and 1 hour total in an 8-hour workday. TR 449-50. As support for these restrictions, Nurse Linville noted only Plaintiff's complaint of fibromyalgia; she did not note any medical or clinical findings. *See id.*

Nurse Linville also opined that, with her right hand, Plaintiff could frequently reach to the front and side, but only occasionally reach overhead, handle, finger, feel, push and pull; and with her left hand, Plaintiff could continuously handle, frequently reach to the front and side, occasionally reach overhead, finger and feel, and never push and pull. TR 451. Despite being asked, Nurse Linville did not provide any support for these opinions. *See id.* With regard to the use of her feet, Nurse Linville opined that, with her right foot, Plaintiff could occasionally operate foot controls, but could never operate foot controls with her left foot. *Id.* As support for these opinions, Nurse Linville cited Plaintiff's left leg pain and swelling. *Id.*

Nurse Linville indicated that she did not evaluate Plaintiff's hearing or vision, but with regard to Plaintiff's postural limitations, Nurse Linville opined that Plaintiff could occasionally climb stairs and ramps, balance, kneel, and crawl, but could never climb ladders or scaffolds, stoop, or crouch. TR 452. As support for these opinions, Nurse Linville wrote "clinical exams." *See id.* For Plaintiff's environmental limitations, Nurse Linville opined that Plaintiff could frequently be exposed to cold, but should never be exposed to unprotected heights, moving mechanical parts, humidity and wetness, dust, odors, fumes, and pulmonary irritants, extreme heat, or vibrations; and should never operate a motor vehicle. TR 453. She further opined that

16

Plaintiff should work in an environment with quiet to moderate noise.  *Id.*  As support for these opinions, Nurse Linville noted only that Plaintiff "gets 'frustrated' around people."  *Id.*

Nurse Linville also indicated that Plaintiff could perform activities like shopping, ambulate with assistance, walk a block at a reasonable pace on rough or uneven surfaces, climb a few steps at a reasonable pace with the use of a single hand rail, prepare simple meals and feed herself, and sort, handle, and use paper or files.  TR 454.  But Nurse Linville also indicated that Plaintiff could not travel without a companion for assistance, and noted that she sometimes needed assistance with caring for her personal hygiene.  *Id.*  Nurse Linville did not provide any support for these opinions, and she left the remaining questions blank.  *See id.*

As has been noted, Nurse Linville did not cite objective support for her opinions.  In order to be accepted, Nurse Linville's opinions on issues regarding the nature and severity of Plaintiff's impairments must be well-supported by medically acceptable clinical and laboratory diagnostic techniques and be consistent with other substantial evidence in the record.  20 CFR §§ 416.927(d); 404.1527(d).  Nurse Linville did not identify the medical evidence upon which she based her conclusions, and, as demonstrated throughout the ALJ's decision, many of those conclusions were contrary to the findings in her treatment notes, Plaintiff's reports, and other evidence of record.

While Plaintiff is correct that the ALJ did not specifically reference Nurse Linville's unsupported medical source statements, he did discuss in detail Plaintiff's treatment notes from the Tennessee Department of Health, many of which were signed by Nurse Linville.  *See e.g.*, TR 21-22, *referencing* 383-85, 387-91 (block quoted herein in the discussions of the other statements of error).  Plaintiff contends that the ALJ's discussion of these treatment notes is

17

insufficient because SSR 06-3p requires that "the adjudicator *must* explain the weight given to the opinion." Docket No. 22 (emphasis added). Contrary to Plaintiff's assertion that the adjudicator *must* explain the weight given to the opinion, SSR 06-3p provides that the adjudicator "generally *should* explain the weight given to opinions from these 'other sources,' *or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case*." SSR 06-3p (emphasis added). As can be seen, SSR 06-3p does not require the ALJ to discuss the opinions of "other sources"; rather, it provides that the ALJ's discussion of the evidence should allow a subsequent review to follow his reasoning when opinions from "other sources" can have an effect on the outcome of the case. *Id.* The ALJ's decision in the case at bar is clear and detailed, and so allows.

Because Nurse Linville did not cite objective medical evidence supporting the opinions expressed in her medical source statements, and because many of those opinions were unsupported by her own treatment notes, by Plaintiff's subjective complaints, and by other evidence of record, the ALJ was not bound to accept them. The ALJ discussed Nurse Linville's treatment of Plaintiff, and properly accepted Nurse Linville's findings that were supported by, and consistent with, evidence of record. The ALJ explained the evidence he considered, the weight accorded thereto, and the reasons therefore. Accordingly, the ALJ complied with SSR 06-3p, and Plaintiff's argument fails.

### 3.  Opinion of Consultative Examiner Dorothy Lambert

Plaintiff asserts that the ALJ did not properly consider Dr. Dorothy Lambert's opinion when making his residual functional capacity determination. Docket No. 12-1. Specifically,

Plaintiff argues that Dr. Lambert's finding that Plaintiff was markedly impaired in her ability to react to changes and assignment of a GAF score of 50, were inconsistent with the ALJ's statement that he considered Dr. Lambert's marked limitation when he made the allowance for only gradual, infrequent workplace changes and limited her to no production rate, pace work. *Id., referencing* TR 26. Plaintiff maintains that the marked limitation assigned by Dr. Lambert was more limiting than that found by the ALJ in his decision. *Id.* Plaintiff contends that the ALJ should have incorporated the exact language used in Dr. Lambert's report into the hypothetical questions he posed to the vocational expert at the hearing, and into his ultimate RFC finding. *Id.* Plaintiff contends that the ALJ ignored the SSA's definition of "marked," and that remand is therefore warranted. *Id.*

Defendant responds that the ALJ's interpretation of Dr. Lambert's finding of marked limitation in adaptation to change was reasonable given that Plaintiff's definition was inapplicable as it was the definition from a medical source statement (mental) form, and Dr. Lambert performed a consultative psychological evaluation instead, and also given that Dr. Lambert neither defined what she meant by marked nor opined that Plaintiff could not adapt to any workplace changes. Docket No. 19. Defendant further contends that the ALJ's interpretation of Dr. Lambert's findings is consistent with other evidence of record. *Id.*

The ALJ discussed Dr. Lambert's findings at length, as follows:

> Dorothy Lambert, Ph.D., performed a psychological evaluation of the claimant in June 2009. The claimant was described as appearing younger than her stated age, although obese. *She ambulated with a normal gait but said she had a bad back and hip pain. The claimant also said she had a complete hysterectomy in the past and was taking hormone medication but her doctors would not renew it. Additionally, she had taken medication for diabetes, but that was also discontinued a few years ago.*

19

*However, Dr. Lambert reported that recent psychiatric records indicated the claimant was taking medication for diabetes.* She also her [*sic*] breathing machine to help with sleep apnea had worn out. Presently, the claimant reported that she was only taking 150 milligrams of Ranitidine two times a day for acid reflux [*sic*] and nausea. She had been obtaining mental health therapy since March 2009 and her current psychotropic medications were Sertraline and Trazadone, each taken one time per day for depression and insomnia. Sertraline was a new medication that helped a lot with her mood swings. Dr. Lambert observed that she was articulate, alert, fully oriented and cooperative throughout the interview; while both her affect and mood appeared cheerful. The claimant endorsed a myriad of symptoms, including depression since 1998 when her grandfather died; crying spells; inability to enjoy things that she had formerly enjoyed (such as being around people, watching movies or soap operas or being outside); nightmares, mood swings ranging from sad to cheerful; fluctuating appetite due to nausea; difficulty falling asleep and staying asleep; low energy; tiring easily; and memory problems that she felt were due to oxygen deficiency caused by sleep apnea. She also reported a history of special education classes while school [*sic*], having trouble learning to read and performing mathematics. The claimant reported quitting school in the ninth grade, after being suspended from school for hitting another student (which she denied), then she got married. *Regarding activities of daily living, the claimant reported the following: doing housework but taking her time because of her bad back, cooking full meals, caring for her ill mother who was on oxygen, sometimes watching television, and enjoying playing cards with her mother and playing with her dogs. A typical day included arising around 10:00 a.m., vacuuming, some washing dishes, sometimes eating breakfast or a sandwhich later, sitting outside watching the dogs, and eating dinner.* The claimant reported having a driver's license and that she could only drive an automatic shift but only for short distances. On testing, the claimant obtained a Full IQ Score of 72, indicating functioning within the borderline range of intelligence. Testing also showed the claimant was functioning at the sixth grade level in reading and at the fourth grade level in mathematics, congruent with functioning in the borderline range. Dr. Lambert opined that the claimant was not impaired in concentration and persistence; mildly impaired in understanding and remembering short, work-like procedures/locations and in social interaction; and seemed markedly impaired in reacting to changes. Exhibit 4F.

20

TR 25, *citing* TR 288-94 (italics original).

In determining how to weigh Dr. Lambert's opinion, the ALJ considered Dr. Lambert's findings in relation to the other evidence of record regarding Plaintiff's mental health, including treatment notes from the Mental Health Cooperative and Centerstone (discussed in greater detail below). The ALJ also discussed the opinions of 2 consultative examiners as follows:

> George T. Davis, Ph.D., viewed the medical evidence and opined that the claimant can do 1 to 3 step tasks; can concentrate and attend for the same tasks for periods of at least 2 hours; can interact and relate to the general public, co-workers and supervisors; and can adapt to work-like settings and changes. Exhibit 10F. George W. Livingston, Ph.D., viewed the medical evidence and opined that the claimant can do simple tasks with normal supervision and has adequate social functioning and adaptation. Exhibit 7F.

TR 25, *citing* TR 314-17, 341-44.

After considering the evidence as a whole, the ALJ found in pertinent part:

> State agency psychological consultant, Dr. Davis' opined limitations are most consistent with the evidence considered as a whole and is given significant weight to the extent that it is consistent with the claimant's established residual functional capacity. Dr. Lambert opined that the claimant had mild limitation in social interaction and understanding simple instructions and seemed markedly limited in adaption to change. Dr Lambert's opinion is given some weight to the extent that it is consistent with the claimant's established residual functional capacity. It must be noted that Dr. Lambert's opined marked limitation in adaptation, as well as, the claimant's testimony were taken into consideration with the allowance of only gradual, infrequent workplace changes and limitation to no production rate, pace work in the claimant's established residual functional capacity.

TR 26.

As evidenced above, the ALJ considered Dr. Lambert's opinion regarding Plaintiff's ability to adapt, along with other medical evidence of record, and Plaintiff's own testimony. The

21

ALJ properly considered the evidence of record and explained his rationale for the evidence he accepted and accorded weight. Plaintiff has cited no authority (and the undersigned has found none) for her proposition that the ALJ must accept and adopt the definition of "marked" contained in a medical source statement (mental) form when the person rendering the opinion did not express the opinion on such a form. Plaintiff's argument on this point is unavailing.

To the extent that Plaintiff may be arguing that the ALJ should have accepted Dr. Lambert's assigned GAF score of 50, GAF scores are not determinative of disability for Social Security purposes. In fact, the Social Security Administration has declined to endorse the GAF scale for "use in the Social Security and SSI disability programs," and has indicated that GAF scores have no "direct correlation to the severity requirements in [the] mental disorders listings." *See* Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746-01 (August 21, 2000). Although "the GAF is a test used by mental health practitioners with respect to planning treatment and tracking the clinical progress of an individual in global terms, the ALJ is not bound to consider its results at the exclusion of other medically reliable evidence." *Alvarez v. Barhart*, 2002 WL 31466411, at *8 (W.D.Tex. October 2, 2002). Nor is a GAF score determinative of an individual's RFC assessment. *Id.* ("A GAF score is not a rating typically relied upon with respect to assessing an individual's RFC under the Act."); *see also Howard v. Commissioner*, 276 F.3d 235, 241 (6th Cir. 2002)(GAF score is not essential in assessing RFC). Accordingly, the ALJ was not bound to accept, or assign weight to, Dr. Lambert's opined GAF score.

With regard to Plaintiff's contention that the ALJ should have incorporated the exact language used in Dr. Lambert's report into the hypothetical questions he posed to the vocational

22

expert at the hearing, and into his ultimate RFC finding, again, Plaintiff cites no authority requiring the ALJ to do so. In fact, the ALJ's hypothetical questions in the case at bar accurately represented Plaintiff's exertional and nonexertional limitations. *See* TR 27, 68-71. The ALJ could, therefore, properly rely on the VE's answers to the hypothetical questions. *See Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994); *Hardaway v. Secretary*, 823 F.2d 922, 927-928 (6th Cir. 1987); and *Varley*, 820 F.2d at 779. Plaintiff's claim fails.

## 4. Effect of Plaintiff's Obesity

Plaintiff argues that the ALJ failed to consider the "exacerbating effects" of her obesity on her other impairments. Docket No. 12-1. Specifically, Plaintiff argues that in determining her residual functional capacity, the ALJ did not adequately consider how her obesity functionally affects her abilities to sit, stand, walk, lift, and carry. *Id*. Plaintiff contends that the ALJ "merely used boilerplate language when he mentioned her obesity," such that his "catch-all statement" was insufficient and requires remand. *Id.*

Defendant responds that the ALJ appropriately discussed Plaintiff's obesity and further responds that Plaintiff "does not point to any evidence of record suggesting that her weight aggravates any other conditions." Docket No. 19.

The ALJ in the case at bar ultimately found that Plaintiff's obesity was a severe impairment, when viewed in combination with her other ailments. TR 18. Plaintiff correctly asserts that SSR 02-1p indicates that obesity may exacerbate other conditions and mandates that "adjudicators . . . consider its effects when evaluating disability." SSR 02-1p. However, contrary to Plaintiff's argument that the ALJ's discussion "merely used boilerplate language . . . [and] made no true analysis of the effects of her obesity," the ALJ specifically stated why he did

23

not find that Plaintiff's obesity functionally limited her in a way that significantly limited her ability to work. The ALJ discussed Plaintiff's obesity as follows:

> . . . Particular attention was given to Social Security Obesity Ruling 02-1p. However, the claimant consistently ambulated with a normal gait, performed household chores, took care of her ill mother, used public transportation, and drove prior to her license being revoked. Therefore, there was no evidence that the claimant's body habitus significantly limited her ability to perform the physical requirements of work.

TR 18.

As can be seen, the ALJ did not use "boilerplate language" or make a "catch-all statement." *See id.* Rather, he explained with particularity why he did not find Plaintiff's obesity to significantly limit her ability to work. This claim fails.

## 5. Subjective Complaints of Disabling Symptoms

Plaintiff contends that the ALJ erred in his evaluation of her credibility. Docket No. 12-1. Specifically, Plaintiff argues that the ALJ simply used boilerplate language and made a conclusory statement that he considered the required criteria, but failed to state the weight he accorded to her testimony and his reasoning therefore, as required by SSR 96-7p. *Id.* Plaintiff further asserts that the ALJ's reasons for finding that Plaintiff was not fully credible were "inaccurate, flawed, and not 'sufficiently specific.'" *Id.*

Defendant responds that the ALJ properly evaluated Plaintiff's credibility and explained his reasoning for discounting that credibility. Docket No. 19. Defendant further responds that the ALJ's finding that Plaintiff was not fully credible was appropriate given her reported performance of a wide range of activities, her failure to consistently comply with treatment, and her reports of improved conditions with treatment. *Id.*

24

The Sixth Circuit has set forth the following criteria for assessing a plaintiff's allegations regarding disabling symptoms:

> [S]ubjective allegations of disabling symptoms, including pain, cannot alone support a finding of disability...[T]here must be evidence of an underlying medical condition *and* (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from the condition *or* (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.

*Duncan v. Secretary*, 801 F.2d 847, 853 (6th Cir. 1986) (*quoting* S. Rep. No. 466, 98th Cong., 2d Sess. 24) (Emphasis added); *see also* 20 C.F.R. §§ 404.1529, 416.929 ("[S]tatements about your pain or other symptoms will not alone establish that you are disabled...."); and *Moon v. Sullivan*, 923 F.2d 1175, 1182-83 ("[T]hough Moon alleges fully disabling and debilitating symptomology, the ALJ, may distrust a claimant's allegations...if the subjective allegations, the ALJ's personal observations, and the objective medical evidence contradict each other."). Moreover, "allegations of pain...do not constitute a disability unless the pain is of such a debilitating degree that it prevents an individual from engaging in substantial gainful activity." *Bradley v. Secretary*, 862 F.2d 1224, 1227 (6th Cir. 1988).

When analyzing the claimant's subjective complaints, the ALJ must also consider the following factors and how they relate to the medical and other evidence in the record: the claimant's daily activities; the location, duration, frequency and intensity of claimant's symptoms; the precipitating and aggravating factors; the type, dosage and effect of medication; and the other treatment or measures to relieve symptoms. *See Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994) (*construing* 20 C.F.R. § 404.1529(c)(2)). After evaluating these factors in conjunction with the evidence in the record, and by making personal observations of the

25

claimant at the hearing, an ALJ may determine that a claimant's subjective complaints of pain and other disabling symptoms are not credible. *See, e.g., Walters v. Commissioner,* 127 F.3d 525, 531 (6th Cir. 1997); *Blacha v. Secretary*, 927 F.2d 228, 230 (6th Cir. 1990); and *Kirk v. Secretary,* 667 F.2d 524, 538 (6th Cir. 1981).

In the instant case, the ALJ ultimately found that, although Plaintiff's medically determinable impairments could reasonably be expected to cause some of her symptoms, Plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms were not fully credible to the extent she alleged. TR 25-26. In making this finding, the ALJ discussed Plaintiff's testimony regarding her subjective complaints and daily activities as follows:

> The claimant testified at the hearing that she weighs 290 pounds and is 66 inches tall. She lives with her ill mother, for whom she cooks. She also does household chores, such as sweeping, cooking, mopping, and the laundry, but it takes two hours to get something done, and six hours to do everything, as she stops and rests while doing so. She also attends church every Sunday. She is right-hand dominant and reads romance books, but only if the words are "big," as diabetes is "messing" with her eyes. Her vision is also blurry when watching television. She can read the clock on the wall and can add a little bit, but cannot multiple [*sic*] or subtract. Her driver's license was suspended in either November or December 2010 because she had no insurance, but prior to that could drive a vehicle with automatic shift. She has left hip, leg and back pain and rates her pain as 9½ on a 0 to 10 pain scale, even with Lyrica and Ibuprofen. She also takes Metformin and two other medications for diabetes, but her sugar level stays high and she experiencing [*sic*] swelling. She also has severe sleep apnea, high cholesterol and high blood pressure. However, her blood pressure is controlled with medication. The claimant also stated she is depressed, hears voices and music playing and sees shadows at night. However, she stopped going to therapy in March 2009. Prozac and Lyrica make her very sleepy, but she also takes medication to help her sleep. The claimant further testified that she can stand five to ten minutes and then has

26

to sit.

> The claimant also indicated in the function report at exhibit 3e that she could not lie down long due to pain, has trouble getting out of the bathtub and cooks daily, but sometimes has to sit in a chair to do so. She also shops in stores for a couple of hours, goes outside often and loves to walk, but cannot walk far. She sits and talks with others once a week, and lists her hobbies as watching television and "music." She also uses public transportation, and drove (at that time), is able to pay bills, count change, and handle a savings account, but cannot n [*sic*] use a checkbook/money orders. She needs no reminders to go places, to take medicine, or to attend to her personal needs. However, she needs encouragement to perform household chores. While she cannot pay attention long, finish tasks, or handle stress or changes well, she follows oral/written instructions okay, and gets along with authority figures in the same fashion.

TR 20-21, *citing* TR 160-67.

The ALJ also discussed Plaintiff's medical records regarding both her physical and mental impairments in great detail. TR 20-22. As to Plaintiff's physical impairments, the ALJ stated:

> Review of records showed an obese individual who reportedly had a history of diabetes mellitus, gastroesophageal reflux disease (GERD), hypertension, obstructive sleep apnea, lumbar degenerative joint disease with scoliosis. However, the evidence of record is devoid of actual diagnostic test results of the lumbar spine or any sleep study confirming obstructive sleep apnea. Although the claimant consistently had complaints of left hip pain, treatment notes merely indicate that an MRI of this affected joint yielded normal results. Exhibit 1F. Notably, the claimant's treatment records reflect essentially no change in the overall physical condition of the claimant as examinations throughout treatment were basically brief and unimpressive; and certainly not indicative of disability.

> In November 2006, the claimant was obtaining care from the Family Health Care Group and reported left hip pain and a cough of six months duration. However, the examination merely indicated the claimant's lungs were clear to auscultation. The

27

following month, a full range of motion was found in her left hip; and her blood glucose level was 94. At that time she weighed 300 pounds. Laboratory test results from July 2007 through August 2008 also revealed blood glucose levels ranging from 83 to 143. Additionally, no abnormality was noted in any system of the claimants body, to include musculoskeletal and neurological during an examination performed in September 2007. A normal examination was again reflected in August 2008, at which time the claimant reported full compliance with all medications without side effects. Exhibit 1F.

The claimant was seen twice in April 2009 at the Med West Family Practice Clinic. Initially, the claimant had complaints of night sweats and hot flashes and reported that she needs a new CPAP machine. The claimant reportedly presented smiling. The only abnormality, upon examination, was a dark red skin irritation below each breast. The claimant was described as alert and friendly during the latter visit. Her blood pressure was read as 135/81 and she weighed 305 pounds. The claimant was advised to avoid fried/white foods, decrease intake of milk, eat more vegetables, watch carbohydrates, and walk daily. Exhibit 3F.

The claimant established care with the health department in January 2010. The claimant reported that she had been diagnosed with diabetes mellitus a "few years ago." and had been without medications since November 2009 because she had lost her health insurance. Her blood glucose level was elevated at 293, while her blood pressure was 148/93. Regardless, examination was, yet again, essentially normal. Specifically HEENT was merely noted as unremarkable, the neck was supple and with full range of motion, the lungs were clear to auscultation, and heart rate was regular and rhythmic. Additionally, all four extremities were without edema, all deep tendon reflexes were equal (approximately one-plus); and no sores were present on either foot. Her medications were re-started. *The following month, the claimant stated she felt great and had more energy*, while simultaneously complaining of right-sided pain (like lying on a rock), lots of gas, and urinary urgency. However, she denied any vomiting or indigestion. The right upper quadrant was found tender, but bowel sounds were positive and no masses were palpitated. Approximately, two weeks later, she was treated for sinusitis. In January 2010, the claimant's diagnoses included fibromyalgia. However, the claimant's treatment records provide little support for such a conclusion, i.e., no positive trigger points and no

28

complaints of widespread joint pain.  *In June 2010, the claimant's blood pressure was 126/79, noted as controlled.  Her fasting blood glucose level was 122.  She was described as alert, oriented and pleasant.  She moved all extremities without tremor and was again was neurologically intact.  Note was taken of the fact that the claimant reported having heart pain when her "sugar was up."  However, she denied this symptom currently, and also denied any associated shortness of breath.*  She also reported that she could not breathe at night due to panic attacks.  Regardless, the claimant was described as alert, oriented and pleasant.  *Her gait was steady.  In November 2010, the claimant reported that her blood glucose levels had been "good."*  However, she had complaints of numbness of the bilateral lower extremities accompanied by swelling and bilateral knee pain, as well.  While decreased sensitivity was discovered in the feet, more so on the left that the right, her knees were non-edemic.  *During the final office visit in April 2011, the claimants fasting blood glucose level was 113.*  She also reported frequent urination, having no balance, as well as, continuing left hip and left knee pain.  *However, she actually stated that ibuprofen "did wonders" for her back pain, but she was out of this medication at the time.*  A urinalysis was performed and yielded negative results.  A new prescription for Lyrica was written.  Exhibit 15F.

The claimant ambulated with a normal gait during a consultative examination performed by Bruce A. Davis, M.D., in June 2009.  She was described as an overweight individual who was in no acute distress and without obvious deformities.  She stood 65 inches tall and weighed 309 pounds.  Her blood pressure was read as 116/82.  Uncorrected visual acuity was 20/25, bilaterally.  Shortness of breath was noted upon examination maneuvers.  However, breath sounds were clear in all lung fields, absent wheeze, rales or rhonchi; while the heart was free of murmur, gallop, rub or click.  Mild bilateral elbow psoriasis with scaling lesions were evident.  There was full range of motion of the cervical spine; and bilateral shoulders, elbows, wrists and fingers, with 5/5 grip.  Lumbar scoliosis was present but neither tenderness nor spasm was appreciated.  Thoracolumbar flexion was performed to 70 degrees, extension to 15 degrees and lateral motion to 20 degrees; while bilateral hip flexion and abduction was done to 120 degrees and 40 degrees, respectively.  Range of motion of the bilateral knees was noted as normal and straight leg raising was negative.  The claimant could not do a complete squat.  No cyanosis, edema, clubbing, or other deformity was present in any

29

extremity.  The claimant performed gait maneuvers with an unsteadily [*sic*] across the room without assistance.  She was neurologically intact.  Dr. Davis determined the claimant could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk four to six hours in an eight-hour workday; sit eight hours in an eight-hour workday; was limited in the ability to ben and squat; and should avoid heat, humidity, climbing and heights.  Exhibit 5F.

TR 20-22, *citing* TR 224-22, 285-87, 295-99, 379-403 (italics original).

Addressing the medical records regarding Plaintiff's mental health, the ALJ stated:

The claimant began treatment with the Mental Health Cooperative in June 2008.  The claimant reported that she had not worked for eight years due to problems with her back.  Additionally, her stomach was upset most of the day.  Consequently, she could not eat.  She experienced depression of such severity that she often stayed in her room, crying all day.  She also endorsed decreased sleep and energy, anhedonia, irritability, lack of concentration, suicidal ideation and auditory hallucinations of hearing a radio or voices (often the voice of her deceased grandfather).  She reported treatment with medication from her treating physician for the past five years, denying any psychiatric stays.  She was referred for ongoing therapy.  The claimant's home was reportedly found cluttered and unclean, with pests crawling on the floor and ceiling during the introductory home visit approximately nine days later.  The claimant explained that she had a bad week because her boyfriend left, but he was now back and they were trying to work things out.  The claimant stated that she enjoyed spending time with her family, and made no mention of any current vocational or educational goals.  In July 2008, during another home visit, she reported having mood swings, and was again having problems with her boyfriend.  Her son was also reportedly a source of stress because had [*sic*] legal issues, and was now required to go to the Job Corps.  When presenting for an office visit (later that same month), *she admitted to the nursing assistant that her sleep was great, sleeping 7-8 hours a night, taking only Trazadone and that her appetite was okay.  However, she reported to the medical management physician (name not indicated) later that same day, that her sleep was poor and her appetite was "low."*  She also endorsed low mood, irritability, chronically low energy that worsened with depression, decreased motivation, being withdrawn, nightmares or trauma, increased startle response, poor interest, and

30

lack of concentration. She also reported a history of physical abuse by her first husband. When going to bed at night, she saw shadows, which were noted as being [*sic*], no true psychotic symptoms of auditory/visual hallucinations or paranoia. She denied any history of mania, euphoria, impulsivity, racing thoughts or decreased need for sleep. While Paxil helped relieve her depression, she still became irritable and snapped at others at times. *During another home visit, the claimant reported feeling much better since being on medications; and her home was observed as being cleaner. Admittedly, her mood improved, she had more energy, and had not been "going off" on family members. The claimant also reported that she handled her son's money, helped her mother with the rent and enjoyed spending time outside "for leisure." By the end of August 2008, the claimant still reportedly felt like she was doing very well with medications.* Her mood had, admittedly, improved overall. *The only help the claimant required was assistance in filling out her application for Social Security disability benefits. Her reported mood was even more stable in September 2008, and she was regularly attending church with her mother. Five days later, the claimant confirmed her progress as she reported to the medication management physician that her mood was good; while her sleep, appetite, energy concentration were all normal.* Her boyfriend then returned and she enjoyed going to church and hanging out with a friend. Review of further Mental Health Records continued to show the claimant repeatedly reported medication compliance with a "good and stable mood." *It also* [*sic*] *notable that in February 2009, the claimant had no immediate physical health concerns.* She was then released from care, as she had relocated. Exhibit 2F.

Subsequently, the claimant initiated mental health therapy with Centerstone (March 2009), at which time, *the claimant admitted, her treatment with the mental Health Cooperative had been very beneficial. The claimant reported that she was a diabetic who "was being controlled on oral medication." She also enjoyed working in a garden, and enjoyed getting out and visiting with friends as well.* The claimant was described as very pleasant, but intellectually limited. She was oriented on all four spheres and spoke with organized speech. Her thought processes and thought content, were deemed normal and within normal limits, respectively; while her behavior and mood were both appropriate. The claimant did return, but not until August 2009, when she underwent a psychiatric evaluation by Bert Hartman, M.D. He noted the claimant's history was not suggestive of mania or

> psychosis, and the claimant currently denied experiencing any hallucinations. The claimant presented as fully oriented, with appropriate appearance and behavior. Although, [*sic*] the claimant's though content was preoccupied, her affect was restricted and her mood, anxious and depressed; her thought processes were normal. The claimant was released from care in March 2010, as she failed to return for further scheduled appointments. Exhibit 16F.

TR 22-24, *citing* TR 245-84, 404-44 (italics original).

As can be seen, the ALJ's decision specifically addresses in great detail not only the medical evidence (including medications, testing, and treatment), but also Plaintiff's testimony and her subjective claims, clearly indicating that these were considered. *Id.*

The ALJ, when evaluating the entirety of the evidence, is entitled to weigh the objective medical evidence against Plaintiff's subjective claims and reach a credibility determination. *See, e.g., Walters,* 127 F.3d at 531; and *Kirk v. Secretary,* 667 F.2d 524, 538 (6th Cir. 1981). An ALJ's findings regarding a claimant's credibility are to be accorded great weight and deference, particularly because the ALJ is charged with the duty of observing the claimant's demeanor and credibility. *Walters,* 127 F.3d at 531 (*citing Villarreal v. Secretary,* 818 F.2d 461, 463 (6th Cir. 1987)). Discounting credibility is appropriate when the ALJ finds contradictions among the medical reports, the claimant's testimony, the claimant's daily activities, and other evidence. *See Walters*, 127 F.3d at 531 (*citing Bradley,* 682 F.2d at 1227; *cf King v. Heckler*, 742 F.2d 968, 974-75 (6th Cir. 1984); and *Siterlet v. Secretary*, 823 F.2d 918, 921 (6th Cir. 1987)). If the ALJ rejects a claimant's testimony as not credible, however, the ALJ must clearly state the reasons for discounting a claimant's testimony (*see Felisky*, 35 F.3d at 1036), and the reasons must be supported by the record (*see King*, 742 F.2d at 975).

After assessing the record in its entirety, the ALJ determined that:

> . . . the claimant's medically determinable impairments could
> reasonably be expected to cause some symptoms; however,
> claimant's statements concerning the intensity, persistence and
> limiting effects of these symptoms are not credible to the extent
> that she alleged for the reasons discussed herein.

TR 25-26.

The ALJ explained:

> In summary, the claimant is not entirely credible regarding the
> severity of her symptoms.  Notably, the claimant stopped work in
> 2000, subsequent to her involvement in a motor vehicle accident,
> yet she alleged disability beginning in 2008.  Additionally, the
> examinations of claimant's lumbar spine were consistently without
> any significant abnormality whatsoever.  There are no diagnostic
> studies suggesting otherwise.  The claimant also stated during a
> mental health visit that her diabetes was controlled with
> medication.  Additionally, shortly after beginning mental health
> therapy, the claimant reported that she was doing well, and stopped
> treatment on her own accord in 2009.  Furthermore, neither her
> physical nor mental limitations prevented her from performing a
> wide range of activities per self report.  The claimant is simply not
> persuasive regarding limitations to the extent that she alleged.

*Id.*

The ALJ observed Plaintiff during her hearing, assessed the evidence of record, reached

a reasoned decision, and explained the reasoning for that decision; the ALJ's findings are

supported by substantial evidence and the decision not to accord full credibility to Plaintiff's

allegations was proper.  Therefore, this claim fails.

## IV.  RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for

Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner

be AFFIRMED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14)

days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections. Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

E. CLIFTON KNOWLES
United States Magistrate Judge